# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SHEET METAL WORKERS LOCAL NO. 33 CLEVELAND DISTRICT PENSION PLAN, Individually and on Behalf of All Those Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS** |
| BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC, BNP PARIBAS S.A., CITIBANK, N.A., CREDIT SUISSE GROUP AG, DEUTSCHE BANK AG, GOLDMAN, SACHS & CO., HSBC HOLDINGS PLC, INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, JPMORGAN CHASE & CO., MARKIT GROUP LTD., MORGAN STANLEY BANK, N.A., THE ROYAL BANK OF SCOTLAND GROUP PLC, and UBS AG, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

I.      INTRODUCTION OF THE CLAIMS ......................................................................... 1

II.     JURISDICTION, VENUE, AND COMMERCE ....................................................... 4

III.    PARTIES ..................................................................................................................... 4

IV.     CO-CONSPIRATORS.................................................................................................. 8

V.      THE CDS MARKET .................................................................................................... 9

  A.    Description of CDS .................................................................................................. 9

  B.    CDS Documentation .............................................................................................. 13

  C.    Settlement of CDS Contracts ................................................................................ 14

  D.    CDS Market Definition ......................................................................................... 16

VI.     CDS TRADING IN THE OTC/RFQ BILATERAL TRADING REGIME ..................... 19

VII.    EXCHANGE TRADING AND CLEARING THREATEN THE OTC/RFQ
        BILATERAL TRADING REGIME ............................................................................ 24

VIII.   DEFENDANTS RESTRAINED COMPETITION IN THE CDS MARKET................. 28

IX.     GOVERNMENT INVESTIGATIONS INTO CDS MANIPULATION ........................ 40

X.      CLASS ACTION ALLEGATIONS ............................................................................ 42

XI.     FRAUDULENT CONCEALMENT............................................................................ 44

## I.  INTRODUCTION OF THE CLAIMS

1.  Plaintiff Sheet Metal Workers Local No. 33 Cleveland District Pension Plan ("Plaintiff") brings this antitrust class action to recover damages for the substantial injuries it and others similarly situated have sustained and to prevent and enjoin from conspiring to restrain competition in the market for credit default swaps ("CDS").  Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters based on the investigations conducted by and through Plaintiff's attorneys.

2.  This antitrust class action concerns anticompetitive conduct in the transaction of CDS contracts by certain of the largest financial institutions in the world, the proverbial too-big-to-fail banks, as well as entities that they own or control which are integral to the CDS market. This conduct, which has prevented the emergence of an efficient and transparent trading market in in CDS, was carried out by Barclays, BNP Paribas, Barclays, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS (collectively, the "Dealer Defendants") as well as through entities they own or control, including Defendant International Swaps and Derivatives Association ("ISDA"), Defendant Markit Group Ltd. ("Markit"), ICE Clear Credit ("ICE"), and the Depository Trust & Clearing Corporation ("DTCC").

3.  The CDS market has been starkly divided between those who control and distort the market and those who, in order to participate in the market, must abide their distortions. Those who wield power are the Dealer Defendants who occupy the "sell side" of the CDS market and maintain a stranglehold over the dealing, clearing mechanisms, transaction data, and standard setting of CDS transactions.  By contrast, CDS market participants on the "buy side" must, by virtue of the Defendants' stranglehold on how CDS are bought and sold, participate in

an inefficient market, characterized by profound information asymmetries that enable Dealer Defendants to maintain anticompetitive bid-ask spreads on CDS contracts.

4.     CDS offer participants in the financial markets the ability to hedge credit risk or express a view on credit risk, *i.e.*, to go "long" or "short" on the credit worthiness of, for example, a corporation or sovereign.  CDS are sold over the counter ("OTC") and not through an exchange.  The OTC market is manipulated on the sell side by the Dealer Defendants.  In order to enter into CDS transactions, a buy side class member must get a quote directly from one of the Dealer Defendants.  This request for a quote ("RFQ") is carried out through Bloomberg message, email, or telephone call.

5.     The quote, of necessity, comes from one or more of the Dealer Defendants because they have successfully conspired to monopolize the sell side of the CDS market.  Because they control the entities, such as Markit and ISDA, that collected transaction data and set standards, Dealer Defendants were able to create and maintain a market where the pricing of CDS was opaque and transactions flowed through institutions such as ICE, which they controlled.  Consequently, Dealer Defendants have been able to fix and maintain anti-competitively wide bid-ask spreads, *i.e.*, what a dealer would be willing to buy and sell a CDS, to the detriment of buy side class members.

6.     Entities on the buy side have chafed over the competitive disadvantages created by Dealer Defendants who have a stranglehold over CDS in the OTC market.  Buy side participants lacked a source of actual, real-time transaction data and had to rely solely on aggregated and stale dealer internal CDS prices published by the Defendant-controlled entity, Markit.  One attempt at bringing market forces to bear was to introduce price transparency through exchange trading of CDS.  This, in fact, was proposed to Dealer Defendants by

prominent buy side participants, including Citadel, LLC ("Citadel"), working together with the clearinghouse CME Group Inc. ("CME"), in 2008. They built CMDX, a joint venture that would have brought exchange trading to the CDS market. When Dealer Defendants' monopoly over the CDS market was threatened with the introduction of an exchange to trade CDS, they boycotted that effort and directed ISDA and Markit to deny CMDX and other market entrants the licenses necessary for market entry. To forestall exchange trading, and in response to regulatory pressures in the wake of the market collapse and recent economic recession, Dealer Defendants created a clearing platform known as ICE, which allowed Dealer Defendants to maintain their stranglehold over the CDS market by preserving the OTC/RFQ bilateral trading regime. Thus, Defendants successfully prevented the introduction of exchange trading in CDS, which would have, among other things, provided real-time pricing information, allowed buy side participants to transact directly instead of through Dealer Defendants, and compressed the bid-ask spread on any given CDS trade.

7.      Not surprisingly, Defendants' egregious anticompetitive conduct, which has included, *inter alia*, price fixing, and boycotting of efficient alternative market mechanisms, has attracted the attention of U.S. and European antitrust enforcement agencies who have open and active investigations underway into Defendants' practices described in this Complaint.

8.      In sum, Dealer Defendants restricted who could act as a dealer, deprived buy side market participants of actual, real-time pricing information, prevented exchange trading, and maintained inflated bid-ask spreads on CDS transactions to the detriment of buy side participants in the CDS market. Dealer Defendants undertook this anti-competitive conduct to forestall entry and maintain control of the CDS market, and consequently, their actions caused billions of dollars of damages to class members during the relevant period.

## II.    JURISDICTION, VENUE, AND COMMERCE

9.      This action arises under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

10.     This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

11.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c), and (d).   One or more of the Defendants resided, transacted business, was found, or had agents in this District; a substantial portion of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

12.     The trade and interstate commerce relevant to this action is the market for the purchase and sale of credit protection through single-name CDS and index CDS.   Each Defendant, directly or through their affiliates or subsidiaries, participated in the market in a continuous and uninterrupted flow of interstate commerce.   The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## III.    PARTIES

13.     Plaintiff Sheet Metal Workers Local No. 33 Cleveland District Pension Plan is located in Parma, Ohio and is a Taft-Hartley defined benefit pension fund organized under the laws of the State of Ohio.   During the relevant period, Plaintiff was a buy side participant in the market for CDS.   Plaintiff entered into CDS transactions with Citibank.

14.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina.  Bank of America maintains offices and transacts business in Chicago, Illinois.   Bank of America is a CDS dealer and acts as counterparty in CDS transactions.   Representatives of Bank of America sit on the boards of ISDA and Markit and on ICE's Risk Committee.  Bank of America is a shareholder of Markit.

15.     Defendant Barclays Bank PLC ("Barclays") is a United Kingdom public company with its corporate headquarters in London, England.  Barclays maintains offices and transacts business in Chicago, Illinois.   Barclays is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of Barclays sit on the boards of ISDA and ICE's Risk Committee. Barclays is a shareholder of Markit.

16.     Defendant BNP Paribas S.A. ("BNP Paribas") is a French banking company headquartered in Paris, France.   BNP Paribas maintains offices and transacts business in Chicago, Illinois.  BNP Paribas is a CDS dealer and acts as counterparty in CDS transactions. Representatives of BNP Paribas sit on the board of ISDA.  BNP Paribas is a shareholder of Markit.

17.     Defendant Citibank N.A. ("Citibank") is a wholly-owned subsidiary of the United States financial services corporation Citigroup, Inc., which is headquartered in New York, New York.  Citibank maintains offices and transacts business in Chicago, Illinois.  Citibank is a CDS dealer and acts as counterparty in CDS transactions.   Representatives of Citibank sit on the boards of ISDA and ICE's Risk Committee.  Citigroup is a shareholder of Markit.

18.     Defendant Credit Suisse Group AG ("Credit Suisse") is multinational financial services holding company headquartered in Zurich, Switzerland.  Credit Suisse maintains offices and transacts business in Chicago, Illinois.   Credit Suisse is a CDS dealer and acts as

counterparty in CDS transactions. Representatives of Credit Suisse sit on the boards of ISDA and ICE's Risk Committee. Credit Suisse is a shareholder of Markit.

19. Defendant Deutsche Bank AG ("Deutsche Bank") is a German public company with its corporate headquarters in Frankfurt, Germany. Deutsche Bank maintains offices and transacts business in Chicago, Illinois. Deutsche Bank is a CDS dealer and acts as counterparty in CDS transactions. Representatives of Deutsche Bank sit on the boards of ISDA and ICE's Risk Committee. Deutsche Bank is a shareholder of Markit.

20. Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a wholly-owned subsidiary of the United States financial services corporation Goldman Sachs Group, Inc., an American public company incorporated and headquartered in New York, New York. Goldman Sachs maintains offices and transacts business in Chicago, Illinois. Goldman Sachs is a CDS dealer and acts as counterparty in CDS transactions. Representatives of Goldman sit on the boards of ISDA and Markit and on ICE's Risk Committee. Goldman Sachs is a shareholder of Markit.

21. Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public company with its corporate headquarters in London, England. HSBC maintains offices and transacts business in Chicago, Illinois. HSBC is a CDS dealer and acts as counterparty in CDS transactions. Representatives of HSBC sit on the boards of ISDA and Markit. HSBC is a shareholder of Markit.

22. Defendant International Swaps and Derivatives Association ("ISDA") is a financial trade association representing participants in the OTC derivatives market. Its members include Dealer Defendants, which control ISDA through seats on its board of directors. ISDA's board is chaired by Stephen O'Connor, a managing director of Defendant Morgan Stanley, and

its members also include Gerhard Seebacher of Bank of America, Harry Harrison of Barclays, Guillaume Amblard of BNP Paribas, Brian Archer of Citibank, Eraj Shirvani of Credit Suisse, Richard Herman of Deutsche Bank, R. Martin Chavez of Goldman Sachs, Elie El Hayek of HSBC, and Diane Genova of JPMorgan.

23.     Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware financial holding company headquartered in New York, New York.  JPMorgan maintains offices and transacts business in Chicago, Illinois.  JPMorgan is a CDS dealer and acts as counterparty in CDS transactions.  Representatives of JPMorgan sit on the boards of ISDA and Markit and on ICE's Risk Committee.  JPMorgan is a shareholder of Markit.

24.     Defendant Markit Group Ltd. ("Markit") is a private financial information company headquartered in London, England and is owned, in part, by 16 shareholder banks, including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS. According to 2009 filings at U.K. Companies House, Bank of America (including its subsidiary, Merrill Lynch), Barclays, Deutsche Bank, Goldman Sachs, JPMorgan, and Royal Bank of Scotland collectively owned 30% of Markit.  Dealer Defendants control Markit through seats on its board of directors.  Markit's board members include Shea Zane Wallon of Bank of America, Paul Walker of Goldman Sachs, Niall Cameron of HSBC, Jeremy Barnum of JPMorgan, and Dexter Emory Senft of Morgan Stanley.

25.     Defendant Morgan Stanley Bank NA ("Morgan Stanley") is an American financial services company headquartered in New York, New York.  Morgan Stanley maintains offices and transacts business in Chicago, Illinois.  Morgan Stanley is a CDS dealer and acts as

counterparty in CDS transactions. Representatives of Morgan Stanley sit on the boards of ISDA and Markit and on ICE's Risk Committee. Morgan Stanley is a shareholder of Markit.

26. Defendant The Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a United Kingdom company headquartered in Edinburgh, Scotland. Royal Bank of Scotland maintains offices and transacts business in Chicago, Illinois. Royal Bank of Scotland is a CDS dealer and acts as counterparty in CDS transactions. Royal Bank of Scotland is a shareholder of Markit.

27. Defendant UBS AG ("UBS") is a Swiss global financial services company headquartered in Zurich, Switzerland. UBS maintains offices and transacts business in Chicago, Illinois. UBS is a CDS dealer and acts as counterparty in CDS transactions. Representatives of UBS sit on ICE's Risk Committee. UBS is a shareholder of Markit.

28. Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs or affairs of the corporation or partnership.

### IV. CO-CONSPIRATORS

29. ICE Clear Credit ("ICE") is a subsidiary of IntercontinentalExchange, Inc. ICE launched on May 9, 2009. Prior to July 16, 2011, ICE Clear Credit operated as ICE Trust. Dealer Defendants control ICE's membership and rules through seats on ICE's Risk Committee, which writes or approves ICE's clearing rules. The membership of ICE's Risk Committee is not publicly disclosed, but at the relevant time was reported to include senior personnel of Defendants, including Ali Balali of Bank of America, Paul Mitrokostas of Barclays, Biswarup

Chatterjee of Citigroup, Andy Hubbard of Credit Suisse, Athanassios Diplas of Deutsche Bank, Oliver Frankel of Goldman Sachs, Thomas J. Benison of JPMorgan, James Hill of Morgan Stanley, and Paul Hamill of UBS.[1]

30.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of, the unlawful conduct alleged herein.

## V.     THE CDS MARKET

### A.     Description of CDS

31.     CDS are considered "derivatives" and are part of the OTC derivative industry.  A derivative is a financial contract linked to the future value or status of the underlying asset to which it refers.  Over-the-counter ("OTC") derivatives contracts are contracts that are not traded on an exchange but, instead, are bilaterally negotiated between two counterparties.  According to a report by Deloitte, the major banks earn approximately $55 billion per year in revenues from OTC derivatives (roughly 37% of overall bank revenues).  Fifteen percent to 20% of these revenues per year ($8 billion to $11 billion) come from CDS.[2]

32.     A CDS is a contract between a buyer of credit protection for some "reference entity" and a seller of credit protection.  The "protection buyer" pays a regular fee to the "protection seller," and the protection seller makes a fixed payment to the protection buyer if the reference entity experiences a defined "credit event" during the life of the contract.  Defined

---

[1]     Louise Story, *A Secretive Banking Elite Rules Trading in Derivatives*, N.Y. TIMES, Dec. 11, 2010, http://www.nytimes.com/2010/12/12/business/12advantage.html?pagewanted=all &_r=0.

[2]     Deloitte LLP, CENTRAL CLEARING FOR OTC DERIVATIVES IMPACT ON OTC REVENUES – WHAT CAN YOU EXPECT beyond COMPRESSION? (2011), http://www.deloitte.com/ assets/Dcom-UnitedStates/Local%20Assets/Documents/FSI/us_fsi_OTCRevenues_POV_updated_080311.pdf , at 3.

credit events are eventualities outlined in CDS, including the default of the "underlier," *i.e.*, the reference entity in respect of which credit protection is bought and sold. CDS reference entities may include corporations, sovereigns, municipalities, or structured-finance vehicles. In addition to the entity they reference, CDS are defined by the amount of protection purchased (the notional amount) and the tenure of the contract (*e.g.*, one, three, five, seven, or 10 years). The price of a CDS is the premium that the buyer must pay to the seller at regular intervals. It is expressed as a percentage of a CDS's notional amount and is denominated in basis points.

33. CDS may have one reference entity, in which case they are "single-name CDS," or a basket of reference entities, in which case they are "index CDS." Index CDS account for approximately 50% of all CDS trades.[3] Index CDS are referenced to a portfolio of single-name CDS, usually of 100 to 125 credits. In most indexes, the single-name CDS carry equal weights in the portfolio. Once the portfolio is formed, it remains static through the life of the instrument. Only a credit event at one of the referenced entities results in the removal of the name from the instrument, as well as a corresponding reduction in notional amount.

34. Markit owns the CDS index families, CDX and iTraxx, which are effectively the sole indices traded. Both the CDX and iTraxx index families provide several sub-indices for various industries or regions and for different maturities. The CDX family of indices is composed of North American and Emerging Markets reference entities as constituencies. The CDX indices are broken out between investment grade (IG), high yield (HY), high volatility (HVOL), crossover (XO), and emerging market (EM). The iTraxx family contains European and Asian reference entities.

---

[3] Gavan Nolan & Tobias Sproehnle, CREDIT DERIVATIVES INDEXES: METHODOLOGY AND USE, INNOVATION IN CDS INDEXES, JOURNAL OF INDEXES, July/August 2011, http://www.indexuniverse.com/docs/magazine/2/2011_189.pdf, at 14.

35.     CDS allow credit risk to be isolated and traded.  In essence, they are synthetic products, which simulate the return of an underlying financial product, where the buyer of credit protection has the equivalent of a short position[4] on the credit asset and the seller of protection has, in effect, a long position[5] on the credit asset.

36.     Protection buyers may use CDS as a hedging strategy to offset exposure to the risk of loss inherent in lending arrangements or the acquisition of debt securities.  For example, imagine XYZ Company purchases $100 million of bonds in ABC Company but wants to eliminate the risk that ABC Company goes bankrupt and fails to pay its investors.  XYZ Company, a protection buyer, can purchase a single-name CDS referencing ABC Company with a notional amount of $100 million and a tenure of five years.  If ABC Company suffers a credit event (as defined in the contract) during the five-year period before the contract expires, the protection seller must pay XYZ Company $100 million less the then-current market value of $100 million of obligations issued or guaranteed by ABC Company (or must buy bonds of ABC Company from XYZ Company at par).  To receive this protection, XYZ Company must pay the protection seller periodic payments over the five-year term of the contract and possibly an additional upfront amount.  The cumulative amount of annual payments is expressed in basis points.

37.     A market participant might also purchase an index CDS for hedging purposes. For example, an investor can purchase an index CDS to hedge a portfolio of bonds.  A CDS

---

[4]     A short position will generate a gain if the value of the asset decreases.

[5]     A long position will generate a gain if the value of the asset increases.

index may be a more cost-efficient way to hedge a broad portfolio than buying individual CDS for each bond.

38.     A protection buyer may enter into a CDS without owning the underlying referenced security.  For example, a supplier that is reliant on one major manufacturer as its primary customer might seek to protect itself against the risk that the manufacturer will fall into bankruptcy.  The supplier could purchase a CDS to hedge against the risk that this major customer might go out of business without owning any debt securities issued by the manufacturer.

39.     CDS also offer protection buyers and sellers the ability to express a view on the credit-worthiness of, for example, a corporation.  An investor with a positive view on the credit quality of a corporation can sell protection and collect payments from a protection buyer. An investor with a negative view of the corporation's credit can buy protection and receive payment if the company defaults on its bonds or experiences some other credit event.

40.     After a buy side participant enters into a CDS transaction with a dealer, the dealer usually enters into an off-setting CDS transaction for the same reference entity and notional amount with another sell side participant.  In this off-setting transaction, the dealer is the buyer and another dealer is the seller.  The offsetting process often repeats itself several times such that an initial CDS contract can lead to multiple offsetting CDS contracts.  According to a Federal Reserve Bank of New York report, over 60% of all CDS transactions are interdealer.[6]  This means that for each CDS transaction involving buy side market participants, there are, on

---

[6]     Kathryn Chen, *et al.*, Federal Reserve Bank of New York, *An Analysis of CDS Transactions: Implications for Public Reporting, Staff Report No. 517* (Sept. 2011), http://www.newyorkfed.org/research/staff_reports/sr517.pdf.

average, three off-setting interdealer transactions.[7]  The notional value of these interdealer transactions is trillions of dollars, although after netting, the outstanding value of these transactions is reduced dramatically, but still exceeds $1 trillion.  Taken together, this means that Defendants systematically engaged in innumerable interdealer transactions in which they essentially passed CDS contracts between themselves multiple times.  In doing so, Dealer Defendants provided to one another real-time price data on CDS – data which was unavailable to buy side market participants.  *See* §V1, *infra*.

### B. CDS Documentation

41.    CDS contracts are highly standardized.  For example, as of 2011, 92% of CDS trades have a standard coupon and 97% have fixed quarterly payment dates.[8]  Documentation of CDS contracts is standardized under "ISDA Master Agreements" and product-specific forms and definitions for CDS.

42.    ISDA is a financial trade association in the OTC derivatives market.  Dealer Defendants control ISDA through seats on its board of directors, which is chaired by Stephen O'Connor, a managing director of Morgan Stanley.  ISDA's board also includes Gerhard Seebacher of Bank of America, Harry Harrison of Barclays, Guillaume Amblard of BNP Paribas, Brian Archer of Citibank, Eraj Shirvani of Credit Suisse, Richard Herman of Deutsche Bank, R. Martin Chavez of Goldman Sachs, Elie El Hayek of HSBC, and Diane Genova of JPMorgan.

43.    ISDA maintains the industry standard OTC derivative contracts.  In 1992, ISDA developed the ISDA Master Agreement, under which parties could enter into swaps and any

---

[7]    Or Shachar, *Exposing The Exposed: Intermediation Capacity in the Credit Default Swap Market* (Feb. 2012), http://www.princeton.edu/bcf/newsevents/seminar/ExposingTheExposed. pdf, at 2.

[8]    Kathryn Chen, *et al.*, *How Might Increased Transparency Affect the CDS Market?*, LIBERTY STREET ECONOMICS, Nov. 23, 2011, http://libertystreeteconomics.newyorkfed. org/2011/11/how-might-increased-transparency-affect-the-cds-market.html.

other form of OTC derivative transaction.[9]  An ISDA Master Agreement is an agreement that documents the overall relationship between two parties that wish to enter into derivative transactions from time to time.  The ISDA Master Agreement is designed to be used to document any category of OTC derivative transaction, such as CDS, interest rate swaps, currency swaps, commodity swaps, equity swaps, caps, collars and floors, currency options, foreign exchange transactions, and options of various types.  ISDA Master Agreements are used in more than 90% of bilateral derivatives transactions globally.   The ISDA Master Agreement constitutes a framework of standardized terms.   The first part of the agreement is a pre-printed form; amendments and elections are set out in the Schedule to the Master Agreement.  Confirmations set out the particular terms of individual transactions entered into under the Master Agreement. In 2002, the ISDA Master Agreement was revised to specifically address CDS contracts.  This document was entitled "Master Confirmation Agreement on Credit Default Swaps."

### C.     Settlement of CDS Contracts

44.     A specified credit event must occur before settlement obligations arise under a CDS.  Under standard ISDA documentation for CDS, the credit events that can trigger the protection seller's payment obligation on a CDS include an issuer's bankruptcy, the acceleration of payments on its obligations, default on its obligations, the failure to pay its obligations, the restructuring of the issuer's debt, or a repudiation or moratorium on payments on its obligations.

45.     The determination of whether a credit event occurs involves consideration of the performance of the reference entity under the CDS.  In 2009, ISDA developed a new Master Confirmation Agreement (the so-called "Big Bang Protocol") that established "Determinations

---

[9]     Allen & Overy, *An Introduction to the Documentation of OTC Derivatives*, ISDA (May 2002), http://www.isda.org/educat/pdf/documentation_of_derivatives.pdf.

Committees," which vote on whether a credit event has taken place.[10]  For a protection buyer to claim payment under a CDS, the regional Determinations Committee must agree that a credit event has occurred.  A Determinations Committee was formed for each of the following regions: the Americas, Asia (excluding Japan), Australia-New Zealand, Europe, and Japan.  A Determinations Committee has 15 voting members, including eight global dealers.  For example, for the Americas region, the voting members include Bank of America/Merrill Lynch, Barclays, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS.  BNP Paribas and HSBC are non-voting members of the Determinations Committee for the Americas.  The Big Bang Protocol also introduced auction settlement protocols, created "look back" provisions instituting a common standard effective date, and standardized CDS coupons.

46.     Once a credit event determination occurs, the protection buyer must satisfy certain conditions to trigger the swap, such as providing the protection seller notice.  Once those conditions are satisfied, settlement of payment from the protection seller may be through cash settlement (of the difference between par and the recovery price of the bond of the defaulted reference entity) or physical settlement, depending on how settlement was specified in the contract.  Where the parties physically settle a CDS, the protection buyer delivers the obligation (such as a bond) to the seller, and the protection seller pays the par value.  Cash settlement was introduced as the volume of CDS contracts written became much larger than the number of physical bonds.  In a cash settlement, the protection buyer does not deliver any obligations to the protection seller.

---

[10]     News Release, ISDA, *ISDA Launches "Small Bang Protocol" and Restructuring Supplement*, July 14, 2009, http://www.isda.org/press/press071409.html.

47.     The size of the cash settlement payment is determined in a credit event auction run by Markit on behalf of ISDA.  The auction proceeds in a two-stage process.[11]  First, the dealers submit bid/offers on specified reference obligations, and Markit identifies the initial market mid-point price of the obligations.   Second, Markit identifies the definitive price (notional value less the auction value) to settle the CDS contract.  This process results in one price to cash settle the potentially numerous contracts triggered by the credit event.  Generally, the payment paid to protection buyers is based on cents per dollar so it can be used across multiple, different-sized CDS notional amounts.  If, for example, the notional amount is 100 cents on the dollar and an auction produced an initial market mid-point price of 20 cents on the dollar, the fixed payment would be 80 cents on the dollar, or 80% of the original notional value.

### D.     CDS Market Definition

48.     The anticompetitive effects alleged in this Complaint occur primarily in the U.S. market for the purchase and sale of CDS contracts ("CDS market").

49.     CDS first appeared in the mid-1990s with banks, including Dealer Defendants, seeking to hedge credit risk in their loan portfolios.  The use of CDS has expanded exponentially since that time, as more players seek credit hedges or simply use CDS as stand-alone investments.  CDS trading volume has also increased as securities became increasingly complex over the course of the late 1990s and early 2000s, in particular, with structured finance obligations such as asset-backed securities and collateralized debt obligations.  The Commodities Futures Modernization Act, signed into law in December 2000, allowed investors to enter into

---

[11]     Sudip Gupta & Rangarajan K. Sundaram, *CDS Credit-Event Auctions* (Sept. 2011), http://www.kellogg.northwestern.edu/Departments/finance/~/media/F96430F422B94184B34D0 AA643D09243.ashx.

CDS contracts without owning the underlying reference entity. This act also greatly increased trading in CDS.

50.     There is no substitute for the protection afforded by CDS. The rapid rise in CDS volume following their inception in 1997 demonstrates that investors turned to CDS to secure the unique and critical function of credit protection. The outstanding notional value of CDS increased from $100 billion in 1998 to $1 trillion in 2000, to $60 trillion in 2007, before dipping to approximately $30 trillion following the recession of 2008.[12]

51.     Dealer Defendants are the largest CDS dealers in the world. During the relevant period, Bank of America, Barclays, BNP Paribas, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, HSBC, Morgan Stanley, Royal Bank of Scotland, and UBS accounted for well in excess of 95% of U.S. CDS dealing by notional amount.[13]

52.     ISDA and Markit are integral to the functioning of the CDS market and Dealer Defendants' scheme to control and manipulate pricing in the CDS market. ISDA and Markit provide the licensing, standards, codes, and transaction information necessary for CDS transactions to take place and consummate, and each is effectively controlled by Dealer Defendants. Moreover, they have assisted Dealer Defendants in their anticompetitive acts by, *inter alia*, helping prevent transparency in the CDS market and the establishment of exchange trading.

53.     Dealer Defendants have been able to exclude new entrants on the sell side and as a result, they face no other significant competitors in the CDS market. For example, Bank of

---

[12]     IntercontinentalExchange, Global Credit Derivatives Markets Overview: Evolution, Standardization and Clearing (Mar. 2010), https://www.theice.com/publicdocs/ice_trust/ ICE_CDS_White_Paper.pdf, at 3.

[13]     Office of the Comptroller of the Currency, U.S. Dept. of the Treasury, QUARTERLY REPORT ON BANK DERIVATIVES ACTIVITIES, http://www.occ.treas.gov/topics/capital-markets/financial-markets/trading/derivatives/derivatives-quarterly-report.html.

America's filings with the Securities and Exchange Commission identify its peer group as including BNP Paribas, Citigroup, Credit Suisse, Goldman Sachs, JPMorgan Chase, Morgan Stanley, Barclays, Deutsche Bank, HSBC, Royal Bank of Scotland, and UBS.[14] Barclays identifies its peer group as including Bank of America, BNP Paribas, Credit Suisse, Deutsche Bank, HSBC, JP Morgan, and Morgan Stanley.[15] Citigroup identifies its peer group as including Bank of America, Barclays, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan Chase, and Morgan Stanley.[16] Credit Suisse identifies its peer group as including Bank of America, Barclays, BNP Paribas, Citigroup, Deutsche Bank, HSBC, JPMorgan Chase, and UBS.[17] Deutsche Bank identifies its peer group as including Barclays, BNP Paribas, Credit Suisse, JPMorgan Chase, and Goldman Sachs.[18] Goldman Sachs identifies its peer group as including Bank of America, Citigroup, JPMorgan Chase, and Morgan Stanley.[19] HSBC identifies its peer group as including Bank of America, Barclays, BNP Paribas, Citigroup, Deutsche Bank, Royal Bank of Scotland, and UBS.[20] JPMorgan Chase identifies its peer group as including Bank of America, Citigroup, Goldman Sachs, and Morgan Stanley.[21] Morgan Stanley identifies its peer group as including Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank,

---

[14]    Bank of America Corp., Definitive Proxy Statement (Schedule 14A), at 30 (March 28, 2012).

[15]    Barclays PLC and Barclays Bank PLC, Report of Foreign Private Issuer (Form 6-K), at 9 (Feb. 15, 2011).

[16]    Citigroup Inc., Current Report (Form 8-K), at 7 (Feb. 19, 2013).

[17]    Credit Suisse Group AG, Annual Report 2012 (Form 20-F), at 50 (March 23, 2012).

[18]    Deutsche Bank, Annual Review 2011, at 144 (March 20, 2011).

[19]    The Goldman Sachs Group, Inc., Definitive Proxy Statement (Schedule 14A), at 5 (April 13, 2012).

[20]    HSBC, Annual Report 2008 (Form 10-K), at 204 (March 2, 2009).

[21]    JPMorgan Chase & Co., Definitive Proxy Statement (Schedule 14A), at 22 (April 4, 2012).

Goldman Sachs, JPMorgan Chase, and UBS.[22] Royal Bank of Scotland identifies its peer group

as including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank,

HSBC, JPMorgan Chase, and UBS.[23] UBS identifies its peer group as including Barclays, BNP

Paribas, Citigroup, Credit Suisse, Deutsch Bank, and HSBC.[24]

54.     As described herein, Dealer Defendants together exercise market power in the

CDS market and their substantial collective market power is protected by high barriers to, and

the extreme difficulty of, entry into the market as well as concerted conduct by the Dealer

Defendants to maintain their sell side monopoly.

## VI.     CDS TRADING IN THE OTC/RFQ BILATERAL TRADING REGIME

55.     CDS do not trade on exchanges but, rather, are bilaterally negotiated, trading

OTC.  In bilateral trading, a CDS dealer delivers via Bloomberg "indicative runs" for various

CDS types to buy side market participants with which it has trading relationships.  To have a

trading relationship with a dealer, the buy side participant must have entered into an ISDA

Master Agreement with the dealer.  Indicative runs are messages that set out indicative, non-

binding prices at which a dealer would consider buying or selling credit production on particular

CDS.  They are effectively invitations to negotiate, and as such, are not binding, but are merely

the first step in the RFQ process by which CDS contracts are transacted.

56.     To enter into a CDS contract, a buy side market participant reviews the indicative

runs and contacts a CDS dealer by phone, email, and/or Bloomberg messaging with an indication

of interest.  The dealer may counter with a price for which they are willing to sell a CDS.  When

---

[22]     Morgan Stanley, Definitive Proxy Statement (Schedule 14A), at 33 (April 5, 2012).

[23]     RBS Group, Annual Report and Accounts 2011, at 288 (March 26, 2012).

[24]     UBS AG, Annual Report 2011, at 32 (March 15, 2012).

the parties reach agreement on price and size, they have an orally executed transaction. Using industry argot, this is sometimes referred to as an "oral done." This oral commitment is subsequently confirmed through an email or other type of writing. The final agreement is subject to the ISDA Master Agreement between the buy side participant and the dealer, and dealers will not execute any trade without such an agreement.

57. In the OTC/RFQ bilateral trading regime, Dealer Defendants participate in virtually all CDS trades. As a practical matter, in a bilateral market requiring bilateral credit relationships to trade, a sell side bank, *i.e.*, a CDS dealer, acts as a counterparty on every CDS transaction. This is because bilateral derivatives trading leaves each party in a longer term relationship of counterparty performance risk. In such circumstances, buy side firms are constrained to transact only with dealers that are perceived to be sound long term credit risk, while dealers utilize the ISDA Master Agreement to provide for one-sided posting of collateral by buy side customers to secure the customer's counterparty performance risk. Only dealers can support the extensive legal and collateral management infrastructure to manage these requirements with a wide range of counterparties, whereas the buy side can only manage to trade with a limited number of dealers and could not, in any event, perform credit assessments on other buy side counterparties. The complexity of negotiating the credit arrangement underlying the ISDA Master Agreement, while not explicitly requiring every trade to have a dealer as a counter-party, for all practical purposes enforces this requirement.

58. Because, as a practical matter in the OTC/RFQ bilateral trading regime, a CDS dealer is required to be on one side of every CDS trade, there is no way for buy side participants to transact directly; they each must trade with a CDS dealer. And in each trade, Dealer Defendants take an outsized cut by manipulating the spread between the bid and the ask.

Therefore, the OTC/RFQ bilateral trading regime favors Dealer Defendants by insuring that they get the opportunity to intermediate and benefit from the spread in every trade.

59. The OTC/RFQ bilateral trading regime provides Dealer Defendants with significant advantages over the parties they transact CDS with. In an OTC market, counterparties engage directly, transacting with one another without the public disclosures involved in trading on an exchange or other formal trading platform. Further, federal regulation historically did not require OTC market participants to register or record their transactions, and sell side market participants prevented actual, real-time trade data from being released to buy side market participants. Accordingly, during the relevant period, pricing in the OTC market for CDS was opaque, and the flow of market information was controlled by Defendants. It is this market price opacity that enhances the ability of Dealer Defendants to maintain wide bid-ask spreads on CDS transactions.

60. During the relevant period, actual, real time trade data was never made available to buy side participants. Rather, the only data made available to the buy side was internal dealer price data, not actual transaction data, filtered through Markit. Markit is owned, in part, by 16 shareholder banks, including Bank of America, Barclays, BNP Paribas, Citigroup, Commerzbank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS, *i.e.*, the Dealer Defendants. According to 2009 filings at U.K. Companies House, Bank of America (including its subsidiary, Merrill Lynch), Barclays, Deutsche Bank, Goldman Sachs, JPMorgan, and Royal Bank of Scotland owned 30% of Markit between themselves.

61. Markit draws pricing data from market participants, including Dealer Defendants. Markit's website previously stated that it had "privileged relationships" with its 16 shareholder

banks, giving it access to a data set spanning credit, equities, and the broader OTC derivative universe. At Dealer Defendants' direction, Markit does not provide the actual CDS trade data it collects to buy side market participants, which serves the economic interests of Dealer Defendants. There is no legitimate reason why Markit would not make this data available, for instance, on a paid subscription basis.

62. Dealer Defendants, on the other hand, had direct access to actual CDS transaction data from interdealer trades. This data was not made available to buy side participants. As described at §V.A., *supra*, after a buy side participant enters into a CDS transaction with a dealer, the dealer usually enters into an off-setting CDS transaction for the same reference entity and notional amount. In this off-setting transaction, the dealer is the buyer and another dealer is the seller. The off-setting process often repeats itself several times such that for each CDS transaction involving buy side market participants, there are, on average, three off-setting interdealer transactions.[25] Outside of the interdealer market, Dealer Defendants have direct access to actual trade information through the provision of clearing services, as described, *infra*, at §§VII and VIII. To handle margining requirements of clearing CDS, Dealer Defendants must obtain actual transaction data.

63. Separately, Markit operates a service where it collects dealer end of day "marks" (prices) on the books of the dealer and then aggregates and "cleanses" this data for retail to customers either the day after collection or during the day of collection depending on the subscription. Dealer marks are the prices ascribed by traders, at their discretion, to positions on the books of the dealer. This data does not provide a real-time picture of market prices since it is

---

[25] Or Shachar, *Exposing The Exposed: Intermediation Capacity in the Credit Default Swap Market* (Feb. 2012), http://www.princeton.edu/bcf/newsevents/seminar/ExposingTheExposed. pdf, at 2.

not based on actual transactions and is always delivered at a lag to actual market transactions. In the relevant period, most CDS investors had little, if any, other price information besides the aggregated, processed, and delayed information that Markit released. Accordingly, buy side participants could not discover actual prices paid or bid by other participants in the market. This information was available solely to Dealer Defendants and the institutions they controlled.

64.     Dealer Defendants also prevented DTCC from publishing CDS price data to the market. DTCC, through its subsidiaries, Deriv/SERV LLC and the Warehouse Trust Company LLC, provides post-trade processing services for CDS transactions, such as posting, matching, and confirmation. It is the only central repository for post-trade reporting, and through these services, DTCC collects CDS price data and trading volume data. Dealer Defendants exert control over DTCC through positions on its board of directors and its control of key operating committees. DTCC board members include Mark Alexander of Bank of America, Neeraj Sahai of Citi, Jonathan Hitchon of Deutsche Bank, Robin Vince of Goldman Sachs, David Weisbrod of JPMorgan, and Stephen Daffron of Morgan Stanley. At Dealer Defendants' direction, DTCC provides CDS price data and trading volume data only to its members and to Markit and does not provide it to the public.

65.     Defendants' conduct has also prevented the few institutions that have attempted to provide CDS price information from providing any additional price transparency. Fitch Solutions ("Fitch") provides CDS pricing data, which essentially provides the same problematic price offerings as Markit – such as aggregate end-of-day CDS dealer marks – but for even fewer CDS than Markit. CMA DataVision, which is owned by CME, covers an even smaller range of CDS than Fitch and bases its price information, in large part, on dealer indicative runs that do not reflect actual or binding transaction values. Bloomberg does not produce its own CDS price

data, but simply offers its subscribers the price information generated by Markit, Fitch, or CME. As a result, market participants are dependent on the aggregated price data provided by Markit and lack sufficient information to evaluate the CDS prices offered and charged by Dealer Defendants.

66. To assess whether CDS prices demanded by Dealer Defendants are set via competitive interactions rather than by manipulation, the buy side needs access to key price information: bids, offers, and actual transaction prices. Price transparency and price discovery are general indications of an efficient competitive market. The lack of real-time price information in the CDS market to buy side market participants, notwithstanding that CDS turns over at a rate of $2 trillion in notional per week,[26] benefitted Dealer Defendants, allowing them to profit from inflated bid-ask spreads. This is in stark contrast to the securities and futures markets, or even the foreign exchange market, where the public can, in real time, see the price of the last transaction traded on the exchanges, as well as current, binding (executable) bids and offers.

## VII. EXCHANGE TRADING AND CLEARING THREATEN THE OTC/RFQ BILATERAL TRADING REGIME

67. In 2008, frustrated by market inefficiencies caused by Dealer Defendant conduct, several large buy side market participants and other entities proposed to remedy the inefficiencies and opacity of the CDS market by developing clearinghouses and exchanges to replace the OTC/RFQ bilateral trading regime.

68. As discussed *supra* at §VI, in the OTC/RFQ bilateral trading regime, buy side market participants (whether buying or selling CDS contracts) will only enter into CDS transactions with a counterparty that has sufficient financial resources to provide credit

---

[26] Alex Kramm, UBS Global Equity Research, *US Exchanges*, at 14 (Aug. 17, 2012).

protection, that is, from a seller that can be depended on to make the payment triggered by a credit event. In the OTC/RFQ bilateral trading construct, the only way for buy side participants to assure themselves that sellers have sufficient financial resources is to engage in OTC transactions with major financial institutions, such as Dealer Defendants, whose resources are known to be very large.

69.     Clearing services eliminate bilateral counterparty credit exposure by interposing a clearinghouse into every trade as the buyer to every seller and the seller to every buyer. A clearinghouse, holding precisely offsetting obligations, makes each payment required to each party and supports its ability to meet those payments through requiring collateral from both parties to the trade and by maintaining default management procedures in the mutualization fund to enable it to perform if one party defaults.

70.     If, in fact, clearing is available, exchange trading becomes possible (if the clearing offering is suitably structured). Although CDS are now traded OTC, CDS could be exchange-traded like securities and futures. Financial products with high trade volume that are relatively standard, for example, certain liquid OTC derivatives such as CDS indexes, are natural candidates for exchange-based trading.[27] Indeed, Dealer Defendants acknowledge this. OTC dealing of CDS has remained only because of the anticompetitive agreements and conduct of Dealer Defendants.

71.     In October 2008, the New York Federal Reserve hosted a meeting with CDS market participants, including Dealer Defendants and buy side participants, to discuss establishing central counterparty clearing in the CDS market. The New York Federal Reserve was in favor of bringing central counterparty clearing to the CDS market because it would

---

[27]     Darrell Duffie, DARK MARKETS: ASSET PRICING AND INFORMATION TRANSMISSION IN OVER-THE-COUNTER MARKETS, at 5 (Princeton Univ. Press 2012).

increase the amount and quality of market information available to market participants, regulators, and the public. In addition, central counterparty clearing for CDS would reduce the systemic risk associated with counterparty credit exposures, illustrated by the collapse of Lehman Brothers and the bailout of AIG. Four potential CDS central counterparties presented clearing proposals at the October 2008 meeting: Citadel/CME (CMDX), IntercontinentalExchange/The Clearing Corporation (ICE), Eurex, and NYSE Euronext. Defendants were able to effectively kill off attempts to wrest clearing to entities they did not control, such as CMDX, Eurex, and NYSE Euronext, by driving clearing volume to ICE, which they controlled, and by refusing to allow exchange trading of CDS to occur. *See* §VIII, *infra*.

72.     In 2008, Citadel and CME entered into a joint venture company, called CMDX, to launch the first fully integrated electronic trading platform and central counterparty clearing facility. Exchange membership in CMDX was to be open to dealers, banks, and institutional investors. Each exchange member could either be self-clearing or could clear through a clearinghouse participant. Clearinghouse membership was to be open to dealers and well-capitalized non-dealers. Citadel and CME expended millions of dollars to develop, build, and test CMDX, such that central clearing and exchange trading through the CMDX venture was feasible as early as the Fall of 2008.

73.     The CMDX exchange and clearing platforms offered numerous advantages over the OTC regime. These benefits included greater market efficiency and more robust risk management through price transparency and the ability to monitor large positions and risk exposures. Exchange trading of CDS would also enhance liquidity through broad-based participation in the exchange. Fungible standardized contracts and anonymous execution on an electronic exchange would improve liquidity and efficiency. Further, in an exchange

environment, participants would not need to rely on their original trade counterparty to exit a trade.

74. In an exchange environment, as opposed to the OTC/RFQ bilateral trading regime, Dealer Defendants would lose their grasp of two important levers leading to compression of bid-ask spreads. First, they would no longer be participants in every single CDS transaction. Second, exchange trading matching anonymous buyers and sellers on the basis of publicly available information would make customers effective competitors to dealers and would drive volume. As competition and volume increase and pricing becomes transparent, spreads compress.

75. Dealer Defendants were aware of the consequences of losing control of the infrastructure in a financial market. In other markets, such as the market for equity options, the creation of an exchange similar to CMDX compressed spreads. The market for equity options once featured wide bid-ask spreads similar to those Dealer Defendants maintain in CDS. The advent of exchange trading in the equity options market enabled new entrants and all-to-all trading and dramatically reduced those spreads, while increasing the volume of equity options traded. The effect on the CDS market of an exchange would have been very similar, but for Defendants' successful efforts to boycott CMDX's exchange platform.

76. Central clearing and exchange trading threatened to end the OTC/RFQ bilateral trading regime Dealer Defendants created and maintained for their own advantage. The CMDX exchange platform would have allowed buyers to make anonymous public bids and sellers to make anonymous public offers, with a computer system matching bids and offers, thus side-stepping the necessity of involving Dealer Defendants as participants in every transaction. Thus, CMDX would have enabled market participants to interact directly with each other and to bypass

Dealer Defendants, a phenomenon also known as disintermediation because it removes Dealer Defendants from the equation and allows for a more efficient market with increased trading volume and compressed bid-ask spreads.

## VIII.   DEFENDANTS RESTRAINED COMPETITION IN THE CDS MARKET

77.     OTC/RFQ bilateral trading of CDS has remained only because of the anticompetitive agreements and conduct of Defendants.  Dealer Defendants viewed a CDS exchange as disruptive to the current dealer business model.  Exchange trading threatened to end the market dynamics Dealer Defendants created and maintained to their advantage.  An exchange would have enabled end user buyers and sellers to interact directly with each other and to bypass Dealer Defendants.  Furthermore, an exchange would have provided actual bid and ask quotes in real time and automatically matched similar bids and asks with immediate clearing.  Recognizing the threat, the Dealer Defendants, ISDA, and Markit conspired to boycott the development of true exchanges, such as CMDX and clearing offerings that could support exchange trading, such as the clearing offerings presented at the October 2008 Federal Reserve meeting by CME, Eurex, and NYSE Euronext.

78.     Dealer Defendants also viewed a buy side clearing offering as a threat to maintaining the bilateral OTC regime, and proceeded to undermine CMDX's clearing platform in favor of a clearinghouse developed by the sell side.  The buy side offering threatened to loosen Dealer Defendants' stranglehold over all aspects of the CDS market.  Threatened with buy side clearing initiatives, such as those promoted through CMDX, and later CME, Dealer Defendants set up a sell side supported clearing house – ICE – in order to funnel CDS clearing through a clearinghouse they controlled.  While ICE allowed for clearing of OTC transactions, it did not, at the direction of Dealer Defendants, support an exchange.

79.     Throughout 2008, Citadel and CME had a series of meetings and communications with key players in the CDS market whose cooperation they needed in order for CMDX to succeed. Dealer Defendant participation in CMDX was critical because they controlled the CDS market as well as Markit and ISDA.

80.     Markit was engaged in licensing negotiations with CMDX in October 2008.[28] It was in Markit's economic interest to participate in launching CMDX because Markit stood to gain revenues from licenses. For example, CMDX planned to launch with all major CDX and iTraxx indices, which Markit owned, as well as their single-name constituents, covering more than 90% of the CDS market. The ability to offer exchange trading of the CDX and iTraxx indexes was important because index CDS constituted approximately 50% of the market. In addition, a functioning exchange would have necessarily created transaction data. Markit was the recipient of dealer mark data in the OTC/RFQ bilateral regime. If an exchange had been set up, Markit was in a position to potentially sell the exchange's transaction data. Accordingly, it was in Markit's unilateral self-interest to participate in the creation of the exchange.

81.     Markit's business decisions are made by Markit's board, which, in turn, is controlled by Dealer Defendants, including: Bank of America, Barclays, BNP Paribas, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS.

82.     Use of certain of ISDA's Master Agreement terms that had become industry standard and access to ISDA credit auction protocols was also crucial to operating CMDX. The leadership of ISDA is dominated by the Dealer Defendants who control ISDA through seats on

---

[28]     CME Group News Release, *CME Group and Citadel to Launch the First Integrated Credit Default Swaps Trading Platform and Central Counterparty Facility, Linked to CME Clearing* (Oct. 7, 2008).

its board of directors, which is chaired by Stephen O'Connor, a managing director of Defendant Morgan Stanley. ISDA's board also includes Gerhard Seebacher of Bank of America, Harry Harrison of Barclays, Guillaume Amblard of BNP Paribas, Brian Archer of Citibank, Eraj Shirvani of Credit Suisse, Richard Herman of Deutsche Bank, R. Martin Chavez of Goldman Sachs, Elie El Hayek of HSBC, and Diane Genova of JPMorgan.

83.     Use of the existing ISDA Master Agreement would allow exchange-traded CDS to mirror market conventions and practices, including the incorporation of ISDA Credit Derivatives definitions, adherence to decisions of the ISDA Determinations Committee, and settlement to the ISDA auction settlement price. It was in ISDA's economic interest to participate in launching CMDX because ISDA stood to gain licensing revenues from the increased volume of transactions and market participants that exchange trading would beget.

84.     Instead of embracing exchange trading, Dealer Defendants agreed to deny CMDX the licenses from Markit and ISDA that were needed to operate an exchange. In order to maintain the monopoly over the OTC/RFQ bilateral trading regime, Defendants boycotted the effort to effect exchange trading through CMDX.

85.     Defendants regularly engaged in communications that facilitated their conspiracy through their membership in Markit, ISDA, ICE, and DTCC. Indeed, the key boards of those institutions are all essentially identical, dominated by Dealer Defendants, and regularly hold private meetings. For example, ICE's Risk Committee meets once a month and includes executives from Defendants JPMorgan, Morgan Stanley, Goldman Sachs, Bank of America, Deutsche Bank, Barclays, and Citigroup. Dealer Defendants also engaged in direct communications with one another, apart from the communications in the course of serving on boards of the key institutions that they control.

86. Although CMDX eventually obtained licenses from Markit and ISDA in or about March and April 2009, the licenses were for the clearing platform only. CME announced that CMDX would be restructured as a clearing-only service, later renamed CME Clearing. Citadel, which the market understood had built the exchange, was no longer a joint venture partner and remained merely a founding member of the newly restructured clearing-only entity. Other buy side founding members included AllianceBernstein, BlackRock, BlueMountain Capital Management, the D. E. Shaw group, and PIMCO. The dealer or sell-side founding members were Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, and UBS.

87. Although they had already prevented CMDX from entering the market as an exchange based competitor, Dealer Defendants also sought to ensure that CME would fail to gain any foothold in clearing CDS. Dealer Defendants proceeded to undermine CME Clearing with a two-part attack. First, they intentionally delayed licensing negotiations between CME Clearing and Markit and ISDA. While Dealer Defendants delayed the launch of CME Clearing, they rushed to make up for CME's head start, and to launch their own clearinghouse – ICE. They succeeded, and launched ICE before CME or any other rival began clearing, thus securing a first-mover advantage for the clearinghouse that they controlled. The vast majority of CDS transactions are cleared through ICE, which allows Dealer Defendants to maintain their control of the CDS market, perpetuate the OTC/RFQ bilateral trading regime and allowed Dealer Defendants to side-step broader market reform and regulation.

88. Second, Dealer Defendants drained the CME clearinghouse of any independent influence it might exert. To that end, Dealer Defendants became members of the CME clearinghouse so that they could exert a measure of control over it by, for example, limiting who

else could join. Further, they simultaneously channeled almost all of the CDS they cleared through ICE. Together, this meant that the CME clearinghouse had a minimal role in the CDS market, a minimal amount of price data, and little ability to promote the rise of "alternative" dealers, apart from Dealer Defendants. Even once CME cleared the first buy side CDS trade on December 15, 2009, Dealer Defendants' founding members froze CME's ability to clear by imposing an extremely low "open interest cap" on the pretext that more work needed to be done to margin methodology. That work could have been done while CME still cleared. Dealers were afraid that CME's clearing approach based off its futures infrastructure would provide a ready foundation for exchange trading and unbiased clearing. They conspired to ensure that ICE became the dominant clearinghouse because they could control ICE and its model.

89.     Dealer Defendants' two-pronged strategy is confirmed by an email written by Sam Cole, COO of BlueMountain Capital, a large buy side participant in the CDS market and a firm that would have embraced exchange trading and clearing on the CMDX platform. The email followed a May 29, 2009 conference call of ISDA's credit steering committee and the buy-side clearing working group. Mr. Cole wrote, "The dealers suggested more than once that there is room for only one solution in the market. The dealer community may be filibustering to protect its oligopoly and not seriously engaged in working with the buy side to develop a clearing solution."[29]

90.     Other institutions attempted to form CDS clearinghouses but they suffered a similar fate as CME. Dealer Defendants simply refused to clear the vast majority of their CDS transactions through any institution other than ICE, which was designed only for trades between dealers and does not support exchange trading. Thus, as of mid-March 2012, CME had cleared

---

[29]     Matthew Leising, *Banks Block CME Credit-Swap Plan, BlueMountain Says*, June 1, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=amm2dc9NuQ_k.

CDS contracts with an aggregate open interest of only $33.3 billion. Another clearinghouse, LCH.Clearnet, had cleared only 1,462 CDS trades with a gross notional value of only €58.7 billion ($76 billion) and an aggregate open interest of €4.6 billion ($6 billion). Two other clearinghouses operated by Eurex and Euronext Liffe have already shuttered their businesses, after the former failed to clear even $1 billion worth of CDS, and the latter did not manage to clear a single CDS trade.

91.     By comparison, as of February 1, 2013, ICE had cleared $21.7 trillion of CDS by gross notional value, including $114 billion in buy side clearing and $2.15 trillion in single-name CDS clearing, resulting in open interest of $738 billion. As of February 1, 2013, ICE Clear Europe (ICE's sister corporation located abroad) had cleared €11.4 trillion ($15.5 trillion) of gross notional value, including €1.59 trillion ($2.17 trillion) in single-name CDS clearing, resulting in open interest of €479 billion ($653 billion).[30]

92.     Dealer Defendants asserted control over the clearing of CDS transactions through ICE, which is the clearinghouse for virtually all CDS transactions. Under the clearing rules established by ICE's Risk Committee, ICE accepts trades only from participants, which, at the launch of the clearinghouse, included Bank of America, Barclays, BNP Paribas, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Merrill Lynch, Morgan Stanley, and UBS. ICE's participants currently include Bank of America, Barclays, BNP Paribas, Citibank, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Royal Bank of Scotland, and UBS.[31] ICE has no buy side clearing members.

---

[30]     B&B Structured Finance, Summary of CDS Clearing Initiatives, http://www. bandbstructuredfinance.com/CDSConferenceCallTheFuture.htm.

[31]     ICE Clear Credit Participant List, https://www.theice.com/publicdocs/clear_credit/ ICE_Clear_Credit_Participant_List.pdf.

93.     ICE's clearing members, Dealer Defendants, are afforded preferential fee treatment and also enjoy a revenue-sharing arrangement with ICE, which provides them with an incentive to patronize ICE and a sustainable competitive advantage versus any other dealer that seeks to be active in the CDS market but does not receive such preferential treatment. Annual revenues on clearing services offered by the banks are estimated to be several billion dollars.[32]

94.     Dealer Defendants control ICE's membership and rules through seats on ICE's Risk Committee, which writes or approves ICE's clearing rules. The members of ICE's Risk Committee are not publicly disclosed, but were reported to include senior personnel of Defendants, including Ali Balali of Bank of America, Paul Mitrokostas of Barclays, Biswarup Chatterjee of Citigroup, Andy Hubbard of Credit Suisse, Athanassios Diplas of Deutsche Bank, Oliver Frankel of Goldman Sachs, Thomas J. Benison of JP Morgan, James Hill of Morgan Stanley, and Paul Hamill of UBS.[33]

95.     To join a clearinghouse, clearing members must meet the clearinghouse's requirements (capitalization, credit quality, and operational readiness) and must be prepared to post a minimum deposit into the guarantee fund. For each transaction that is cleared, participants must post initial margin for the transaction in an amount determined by the clearinghouse and will also post or receive daily variation margin as determined by the clearinghouse based on daily price changes. Initial margin represents a reserve that is intended to cover changes in price on the position during the period from the default of a clearing member to the point at which the position is liquidated. Variation margin settle changes in value of a position or portfolio through

---

[32]     Katy Burne, *CFTC OK's $50 mln minimum rule for swap clearing*, Oct. 18, 2011, http://www.marketwatch.com/story/cftc-oks-50-mln-minimum-rule-for-swap-clearing-2011-10-18.

[33]     Louise Story, *A Secretive Banking Elite Rules Trading in Derivatives*, N.Y. TIMES, Dec. 11, 2010, http://www.nytimes.com/2010/12/12/business/12advantage.html?pagewanted=all &_r=0.

cash, credits, or debits so that at close of each variation margin cycle there is no current amount owed by or to any participant in the clearinghouse, thereby eliminating current credit exposures. If a party to a CDS transaction is not a member of a clearinghouse, to use a clearing service, it must engage the services of an entity that is a member of a clearinghouse.

96.     At the relevant time, ICE's Risk Committee determined the amount of capital that a member must have to join the clearinghouse.  Initially, ICE required members to have $5 billion of net capital in their derivative units to join ICE.  This requirement was set up to protect Dealer Defendants' market share in the CDS market.  Thus, ICE's clearing rules and membership requirements have the effect of excluding buy side participation in the clearinghouse, and as a result, ICE only clears CDS transactions with a dealer on at least one side of the transaction.

97.     Further, even major institutions such as BNY Mellon and State Street were unable to meet ICE's membership requirement.  BNY Mellon's application to become a clearing member of ICE in 2010 was rejected because its derivatives operation had too little capital. Sanjay Kannambadi, chief executive of BNY Mellon Clearing, is reported as commenting on the rejection, "We are not a nobody.  But we didn't qualify.  We certainly think that's kind of crazy."[34]  Without access to the clearinghouse, those institutions could not develop meaningful CDS dealing operations.

98.     Under pressure to reform and in anticipation of action by the U.S. Commodities Futures Trading Commission ("CFTC"), in July 2011, ICE lowered its membership requirement from $5 billion to $100 million in net capital.  At the same time, ICE required that entities

---

[34]     Louise Story, *A Secretive Banking Elite Rules Trading in Derivatives*, N.Y. TIMES, Dec. 11, 2010, http://www.nytimes.com/2010/12/12/business/12advantage.html?pagewanted=all &_r=0.

organized as broker-dealers or future commission merchants hold 5% of customer funds as excess net capital. The 5% margin requirement effectively prevented smaller entities from entering the CDS clearing business.[35]

99.     As part of the CFTC's rulemaking process, the U.S. Department of Justice ("DOJ") raised concerns that a clearinghouse's "captured committees could serve as a mechanism for attempts to further restrict competition among dealers and other market participants."[36] Specifically, major dealers controlling a clearinghouse's operations "could result in their restricting access to new clearing members in an effort to insulate themselves from competition in making markets . . . ."[37] The DOJ further advised the CFTC that "[t]hese actions against potential new clearing members could be explained away, for example, by expressing risk management-related concerns."[38]

100.    In October 2011, the CFTC finalized a rule lowering the capital membership requirement for firms to become clearing members to $50 million. The purpose of the CFTC's action was to reduce risk to the financial system resulting from concentration of CDS among the

---

[35]     Matthew Leising, *ICE Clear Credit's Member Rules Too Exclusive, Small Firms Say*, Bloomberg, Aug. 9, 2011, http://www.bloomberg.com/news/2011-08-09/ice-clear-credit-s-member-rules-too-exclusive-small-firms-say.html.

[36]     U.S. Dept. of Justice, Comments on Proposed Rules Limiting Ownership and Regulating Governance for Derivatives Clearing Organizations, Designated Contract Markets, and Swap Execution Facilities, Before the U.S. Commodity Futures Trading Comm'n, Washington, D.C., at 9, *In re* RIN 3038-AD01 (Dec. 28, 2010), http://www.justice.gov/atr/public/comments/265618.pdf.

[37]     *Id*. at 8.

[38]     *Id*.

dealers that dominate the industry. ICE, however, maintained the 5% capital rule, which still operates to exclude broker-dealers and future commission merchants from clearing CDS.[39]

101.    ICE's membership requirements are unnecessarily excessive, such that few institutions, besides Dealer Defendants, can meet them. The membership requirement effectively excludes other institutions from dealing CDS and competing with Dealer Defendants for clearing services, since those institutions cannot access vital clearing services.

102.    By seizing and maintaining control of the CDS trading infrastructure, Dealer Defendants were able to maintain inflated CDS transaction spreads, and artificially inflate the amount of money that they received on each CDS transaction to the detriment of buy side market participants. Market makers, including Dealer Defendants, have long resorted to similar schemes to increase their profits. As financial products move from controlled trading environments to exchange trading characterized by straight through processing of orders, the price for executing and clearing transaction significantly reduces. Two such examples are equity options and NASDAQ. Economic data drawn from the market equity options and the market for NASDAQ securities illustrate the dramatic price reductions that would have resulted had the Defendants not conspired to exclude exchanges from the CDS market. In addition to illustrating the magnitude of the changes the market would have seen, these examples provide useful benchmarks for calculating the damages suffered by Plaintiff and other buy side market participants. Moreover, these benchmark markets show a marked increase in volume that is indicative of the increase in the volume of CDS trading that would have occurred had Defendants not conspired to exclude completion in the CDS market.

---

[39]     Katy Burne, *CFTC OK's $50 mln minimum rule for swap clearing*, Oct. 18, 2011, http://www.marketwatch.com/story/cftc-oks-50-mln-minimum-rule-for-swap-clearing-2011-10-18.

103.    The price quotes for equity options long ago traded on a RFQ system, much like the current CDS system.  Starting in 1973, the Chicago Board Options Exchange ("CBOE") opened an exchange and clearinghouse for equity options which resulted in straight-through processing, and by 1977, exchange-trading of options was universal.  The spreads on these derivative products experienced a significant compression as a result.  In addition, this reduced pricing provided a significant increase in the volume of equity options traded.  For example, on CBOE's first day in April, 1973, 900 options contracts traded.  By the end of the year, one million options contracts had traded on the exchange.  Within 10 years, 500,000 contracts were trading per day.[40]

104.    The pricing of NASDAQ shares was fixed by many of the same Defendants that fix prices and exclude competitors in the CDS market.  This price-fixing led to enforcement by the DOJ and private suits, which introduced competition into the market leading to the advent of exchange trading.  Prior to an industry report shedding light on possible price fixing, NASDAQ market makers had enforced a minimum spread of ($0.25) on a RFQ system by not posting odd-eighth quotes for a majority of large NASDAQ stocks.[41]  This led to higher trading costs. Litigation pursued by the DOJ and private litigants resulted in the quoting of NASDAQ shares at odd-eighths ($0.125 increments) and provided an opportunity for more players to enter the market.[42]  In addition to the changes resulting from litigation, the Securities and Exchange

---

[40]    Jerry W. Markham, A FINANCIAL HISTORY OF THE UNITED STATES, Vol. III, from the Age of Derivatives into the New Millennium (1970-2001) (2002).

[41]    *See* William G. Christie, Paul H. Schultz, *Why do NASDAQ Market Makers Avoid Odd-Eighth Quotes?* THE JOURNAL OF FINANCE, Vol. 49, No. 5, December 1994, at 1813-1840.

[42]    Michael Barclay; William Christie; Jeffrey Harris; Eugene Kandel; Paul Schultz, *Effects of Market Reform on the Trading Costs and Depths of Nasdaq Stocks The Journal of Finance,* Vol. 54, No. 1 (Feb. 1999), at 1-34 (most widely accepted analysis of the situation by the industry).

Commission ("SEC") imposed new trading rules for NASDAQ leading to a decline in quoted and effective spreads of approximately 30%.[43]  As more entities were allowed to enter into the pricing of NASDAQ shares, the price declined to mere pennies on the dollar, resulting in a reduction in spreads to around 5% of the previous cost of trading.[44]  Correspondingly, this reduced pricing provided a significant increase in the volume of shares traded on NASDAQ shares.

105.    CDS pricing would have followed the same trajectory of compressed spreads and increased volume had CMDX opened as planned in November 2008.  Plaintiff and the class would have experienced a significantly reduced price for execution and clearing on its CDS purchases in line with the decreases in prices for NASDAQ shares and equity options when competition and exchange-trading were brought into the marketplace.  Such a transaction price decline, spread compression, and resulting increase in volume would have been expected to occur had exchanges been successful.  Plaintiff and other buy side participants would have experienced significantly reduced prices for execution and clearing on single-name CDS and index-CDS purchases.  Plaintiff estimates that the OTC/RFQ bilateral trading regime maintained by Defendants inflated CDS prices by approximately 17 to 34 times the cost of trading on an exchange such as CMDX.  These inflated spreads result in an overcharge to buy side CDS market participants of more than $7 billion per year.

---

[43]     *Id.*

[44]     Louise Story, *A Secretive Banking Elite Rules Trading in Derivatives*, NY TIMES, Dec. 11, 2010, available at http://www.nytimes.com/2010/12/12/business/12advantage.html?pagewanted=all&_r=0.

## IX.    GOVERNMENT INVESTIGATIONS INTO CDS MANIPULATION

106.    Defendants' conspiracy to manipulate the CDS market spurred numerous government investigations.    The DOJ and the European Commission ("EC") have been investigating the data provider Markit, along with its 16 shareholder banks.

107.    In July 2009, Markit disclosed that the DOJ was investigating the CDS market to determine if banks manipulated pricing data and index formulation.    The DOJ investigation primarily focused on whether dealers that have an equity stake in Markit have an unfair advantage over other market participants relating to CDS price information.    The DOJ issued civil investigative demands to the banks that own Markit to determine if they have unfair access to price information.    Certain of the Dealer Defendants have disclosed the DOJ's investigation and subpoenas:    Citigroup,[45] Deutsche Bank,[46] Goldman Sachs,[47] JPMorgan Chase,[48] and Morgan Stanley.[49]    The investigative demands sought detailed information about the bank-owners' CDS exposures and their relationship to Markit.    In addition, the DOJ has taken depositions of both Defendants and their victims.    The DOJ has recently expanded its antitrust investigation into Markit to include TCC, which was owned by Dealer Defendants and, after a merger, formed ICE.

108.    On April 29, 2011, the EC opened two antitrust investigations into the financial institutions and clearinghouses that operate the market for CDS.    Both investigations focused on the ability of competitors to enter the market and compete with Markit and ICE Clear Europe.

---

[45]    Citigroup, Inc. Quarterly Report (Form 10-Q), at 220 (Aug. 3, 2012).

[46]    Deutsche Bank Financial Report 2011, at 312 (March 20, 2012).

[47]    Goldman Sachs, Annual Report 2012 (Form 10-K), at 220 (March 1, 2013).

[48]    JPMorgan Chase & Co., Annual Report (Form 10-K), at 319 (Feb. 28, 2013).

[49]    Morgan Stanley, Annual Report (From 10-K), at 33 (Feb. 26, 2013).

The EC examined whether Markit colluded with its 16 bank owners in order to control the financial information on CDS. The EC has indicated that these 16 banks, which act as dealers in the CDS market, give most of the pricing, indices, and other essential daily data exclusively to Markit.[50] These actions could be the consequence of collusion between them or an abuse of a possible collective dominance and may have the effect of foreclosing the access to the valuable raw data by other information service providers.[51]

109.    On March 26, 2013, the EC announced that it was extending its CDS investigation to include ISDA. The EC is examining whether the 16 investment banks that are the targets of the investigation used ISDA to coordinate efforts to delay or prevent exchanges from entering the credit derivatives business.[52]

110.    CDS transactions are part of a market that has historically been largely unregulated by the securities and futures trading laws. The Commodities Futures Modernization Act of 2000 ("CFMA") explicitly limited the regulation of OTC derivative transactions by sophisticated parties, such as "futures" under the Commodity Exchange Act of 1936 (CEA) or "securities" under the federal securities laws. For example, OTC market participants generally structured their activities in CDS to comply with the CFMA's "swap exclusion" from the Securities Act of 1933 and the Securities Exchange Act of 1934. Neither the SEC nor the CFTC sits as an antitrust enforcement body with respect to agreements by market participants to fix, maintain, or inflate prices; conspire to monopolize the market; or boycott market entrants. The

---

[50]    Press Release, European Union Commission, *Antitrust: Commission probes Credit Default Swaps market*, Apr. 29, 2011, http://europa.eu/rapid/press-release_IP-11-509_en.htm.

[51]    *Id.*

[52]    Press Release, European Union Commission, Antitrust: Commission extends CDS information market investigation to International Swaps and Derivatives Association (ISDA), March 26, 2013, http://europa.eu/rapid/press-release_IP-13-286_en.htm.

SEC and CFTC do not, and cannot, regulate the functioning of the CDS market as it relates to dealer control of entities such as Markit and ISDA.

## X. CLASS ACTION ALLEGATIONS

111. Plaintiff brings this action as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Class" is defined as:

> All "buy side" persons or entities which bought or sold CDS contracts directly from "sell side" Dealer Defendants (or their subsidiaries and/or affiliates), between January 1, 2008 and December 31, 2011. Excluded from the Class are defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, the United States government, and the Court and any members of the Court's immediate family.

112. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least tens of thousands of geographically dispersed Class members purchased CDS during the relevant period consistent with the class definition.

113. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of the antitrust laws as alleged herein.

114. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the antitrust laws as alleged herein. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

115.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether Defendants conspired to manipulate the CDS market, including the fixing and maintenance of supracompetitive CDS spreads, in violation of the Sherman Act;

(b)     whether Defendants conspired to maintain and perpetuate the OTC/RFQ bilateral trading regime by which they controlled the CDS market;

(c)     whether Defendants conspired to obtain and maintain their sell side monopoly in the CDS market;

(d)     whether Defendants agreed to boycott market entrants such as CMDX and CME from the CDS market and prevent the introduction of exchange trading in CDS; and

(e)     the appropriate measure of damages for the injury sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

116.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.   The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.   A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

117.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.   The Class has a high degree of cohesion and prosecution of the action through representatives would be unobjectionable.   The amounts at stake for Class members, while substantial in the aggregate, are often not great enough

individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## XI.     FRAUDULENT CONCEALMENT

118.    By its very nature, the unlawful activity, as alleged herein, was self-concealing. Defendants conspired and engaged in secret and surreptitious activities in order to manipulate the CDS market and maintain inflated CDS spreads.

119.    Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of the conspiracy.

120.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of the agreements alleged herein.

121.    None of the facts or information available to Plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint. Plaintiff was lulled into believing that the CDS prices offered to it was the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

122.    As a result, Plaintiff was prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until at least July 2009 when the DOJ publicly acknowledged its investigation of Markit.

123.    There are many reasons why these facts could not have been known: (1) Defendants' trades and trading strategies are not public information; (2) clearinghouses do not publish information concerning particular trading entities, including trading between dealer

entities; and (3) the bilateral, non-exchange traded nature of the trades at issue further obscures what Defendants were, and are, doing at any particular time.

124.     Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIM ONE

**Sherman Act §1:  Conspiracy to Fix and Maintain CDS Spreads against Dealer Defendants**

125.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-124.

126.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

127.     The conspiracy consisted of a continuing agreement, understanding, or concerted action to maintain and/or inflate bid-ask spreads on CDS transactions.  The combination and conspiracy to restrain trade in the CDS market has been effectuated by the means set forth above, among others.

128.     The conspiracy is a per se violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the CDS market, as set forth above.  There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' conduct.

129.     The conspiracy caused the injuries to competition in the CDS market, including, among others:  the prices charged to Plaintiff and the Class were fixed at artificially derived levels; Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted

competition in the CDS market; Plaintiffs and the Class have been deprived of the benefits of innovation and openness that would have flowed from exchange trading; and competition in establishing the prices paid under CDS contracts has been unlawfully restrained and eliminated.

130.    As a proximate result of Defendants' violation of Section 1, Plaintiff has suffered injury to its business and property.  Plaintiff is entitled to treble damages for the violations of the Sherman Act alleged herein.

## CLAIM TWO

**Sherman Act §1:  Conspiracy to Monopolize the CDS Market against Defendants**

131.    Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-124.

132.    Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

133.    The conspiracy consisted of a continuing agreement, understanding, or concerted action to monopolize the sell-side of the CDS market and thus control the dissemination of information, selling of rules and standards, issuance of licensing, and ultimately pricing in the CDS market.  Defendants accomplished this, in part, through their ownership and control of Markit, ISDA, ICE, and DTCC.  The combination and conspiracy to restrain trade in the CDS market has been effectuated by the means and acts set forth above, among others.

134.    The conspiracy is a per se violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the CDS market, as set forth above.  There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' conduct.

135.    The conspiracy caused the injuries to competition in the CDS market, including, among others:  the prices charged to Plaintiff and the Class were fixed at artificially derived levels; Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the CDS market; Plaintiffs and the Class have been deprived of the benefits of innovation and openness that would have flowed from exchange trading; and competition in establishing the prices paid under CDS contracts has been unlawfully restrained and eliminated.

136.    As a proximate result of Defendants' violation of Section 1, Plaintiff has suffered injury to its business and property.  Plaintiff is entitled to treble damages for the violations of the Sherman Act alleged herein.

## CLAIM THREE

**Sherman Act §1:  Group Boycott of Potential Market Entrants against Defendants**

137.    Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-124.

138.    Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §1 of the Sherman Act.

139.    Defendants entered into a continuing agreement, understanding or action to prevent the creation of clearing and exchange trading in the CDS market by entities which they did not own or control.

140.    Each Dealer Defendant agreed not to do business with CMDX and other entities that proposed to initiate clearing and exchange platforms for CDS trading.

141.    Markit agreed not to do business with CMDX and other entities that proposed to initiate clearing and exchange platforms for CDS trading.

142.    ISDA agreed not to do business with CMDX and other entities that proposed to initiate clearing and exchange platforms for CDS trading.

143.    The conspiracy is a per se violation of §1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the CDS market as set forth above. There is no legitimate business justification for, or price competitive benefits caused by, Defendants conduct.

144.    The conspiracy caused the injuries to competition in the CDS market, including, among others:  the prices charged to Plaintiff and the Class were fixed at artificially derived levels; Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the CDS market; Plaintiffs and the Class have been deprived of the benefits of innovation and openness that would have flowed from exchange trading; and competition in establishing the prices paid under CDS contracts has been unlawfully restrained and eliminated.

145.    As a proximate result of Defendants' violation of §1, Plaintiff has suffered injury to its business and property.  Plaintiff is entitled to treble damages for the violations of the Sherman Act alleged herein.

## **RELIEF SOUGHT**

Accordingly, Plaintiff demands relief as follows:

A.      That the unlawful conduct alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act;

B.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

C.      That the Court award damages sustained by Plaintiff in an amount to be proved at

trial, to be trebled according to law, plus interest, including prejudgment interest, attorneys' fees and

costs of suit; and

D.      That the Court directs such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

DATED:  May 3, 2013                           FREED KANNER LONDON & MILLEN LLC

                                              /s/ Michael J. Freed
                                              _____
                                              MICHAEL J. FREED
                                              STEVEN A. KANNER
                                              DONALD L. SAWYER
                                              2201 N. Waukegan Rd., Suite 130
                                              Bannockburn, IL 60015
                                              Telephone:  224-632-4500
                                              224-632-4521 (fax)

                                              SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                                              CHRISTOPHER M. BURKE
                                              KRISTEN M. ANDERSON
                                              707 Broadway, Suite 1000
                                              San Diego, CA  92101
                                              Telephone:  619-233-4565
                                              619-233-0508 (fax)

                                              SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                                              DAVID R. SCOTT
                                              156 South Main Street
                                              P.O. Box 192
                                              Colchester, CT  06415
                                              Telephone:  860-537-5537
                                              860-537-4432 (fax)

SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
DONALD A. BROGGI
MAX SCHWARTZ
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174-4099
Telephone: 212-223-6444
212-223-6334 (fax)

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
THOMAS J. UNDLIN
K. CRAIG WILDFANG
STACEY P. SLAUGHTER
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402
Telephone: 612-349-8500
612-339-4181 (fax)

THE MOGIN LAW FIRM, P.C.
DANIEL J. MOGIN
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-687-6611
619-687-6610 (fax)

LINDH FOSTER, LLC
ERIC L. FOSTER
29 Soundview Road, Suite 11B
Guilford, CT 06437
Telephone: 203-533-4321
203-538-1007 (fax)

*Counsel for Plaintiff*